Commonwealth *v.* Rhey et al., Appellants.

Argued October 2, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Charles B. Prichard,* for appellants.

*Roy T. Clunk,* Assistant District Attorney, with him *Andrew T. Park,* District Attorney, for appellee.

OPINION BY HIRT, J., June 25, 1940:

Defendants Hobart Rhey, Albert Pryel and Joseph Frank were convicted of embracery and of conspiracy to commit embracery on indictments ordered by the court after an investigation of a grand jury. Thomas

342

Clougherty and Thomas Mulkearn, the other two defendants, were acquitted by direction of the court. All defendants were tried together on both charges.

Hobart Rhey, Beulah B. Pryel, wife of Albert Pryel and others had been charged with violations of the election laws at the Primary Election of 1937 in the Borough of Homestead. Mrs. Pryel was the judge of election and all of the other defendants were members of the election board except Hobart Rhey. That case was continued from time to time but was finally set definitely for trial on November 15, 1938. All of the defendants in that case met in the office of their attorney at his request four days before that date and he suggested an investigation of the 240 jurors on two panels, summoned for the trial of cases at that term. He provided printed jury lists but definitely instructed them not to contact the jurors but merely to investigate them, principally for political affiliations. These lists were broken down and the names were rearranged with reference to the localities in which the jurors lived. From an examination of fifty typewriters it was found that typewritten lists of the names of jurors were made in the Borough office in Homestead. When typed, the sheets had been cut into slips containing from five to six names each which were placed in a number of separate envelopes and distributed among various persons including some of the defendants in the election case and the defendants in this case.

On November 12, 1938 John Braszo, a funeral director in McKees Rocks was accosted by defendants Frank and Pryel. Frank had a number of the typewritten slips which he gave to Braszo; he spoke of the election case about to be tried and asked Braszo to see these jurors, to induce them to acquit the defendants in that case because they were good people. Defendant Rhey joined the group during the conversation and was present when one of the slips was given to Braszo. Instead of approaching these jurors Braszo later sent for Robert

McKinley, a friend and his former attorney, a member of the Allegheny County Bar, and reported the incident to him and gave him the jury slips. While they were together, defendant Frank called Braszo on the telephone and asked for a report. McKinley reported the matter to the District Attorney and gave him the slips but declined to disclose from whom he had received them. This and other information, which indicated a widespread effort to influence jurors unlawfully, prompted the petition to the court for a grand jury investigation. The matter was submitted to the grand jury then sitting which after an investigation recommended charges against the defendants. Defendants moved to quash the indictments ordered by the court as a result of the investigation, alleging that they charge specific offenses which properly may not be the subject of a grand jury investigation; that defendants' constitutional rights had been violated in that no information had been lodged against them and that they had not been given a preliminary hearing; that one of the defendants was called as a witness before the grand jury and was compelled to testify. The indictments were also challenged on the broad ground alleged, that the subject matter of the investigation was not of such general public import as to justify the extraordinary procedure. The refusal to quash is assigned as error.

Though within its sphere of action the grand jury is independent of the other administrative branches of our criminal law yet its power of initiating prosecution is confined within very narrow limits. The restrictions imposed upon the grand jury are also limitations upon the power of the court both as to the procedure and the scope of the investigation. To justify the submission of criminal charges to a grand jury, thus initiating a criminal prosecution by that extraordinary method, the subject of the investigation must be of general public importance affecting the entire community. It is only upon such urgent necessity that one accused of crime

may be deprived of the opportunity of hearing and examining the prosecutor and his witnesses as to the time, place and circumstances of the offense charged thus enabling him "if he is an innocent man to prepare his defense, a thing of the hardest practicability if a preliminary hearing is not afforded to him": *Lloyd & Carpenter's Case*, 3 Clark 188. The offenses brought to the attention of the court in the District Attorney's petition come within the class of crimes which affect the public generally and are properly the subject of general complaint. The petition alleged "that divers persons in some instances acting individually, and in others in concert, have been attempting to corrupt and influence a number of jurors who have been duly summoned and are now serving ...... and have been endeavoring ...... to bias the mind and judgment of said jurors in regard to a case now pending ......" in the court of Quarter Sessions of Allegheny County. Based upon information received and some investigation the petition states: "Petitioner is reliably informed and believes that the aforesaid efforts have been widespread and calculated to attempt to corrupt and influence a large number of jurors now serving." The District Attorney was in possession of some facts indicating a widespread violation of the law but was not informed as to the identity of all of the offenders.

A conspiracy to corrupt jurors is a matter of serious public concern and doubly so if the effort is directed toward the members of a panel from which a jury is about to be drawn for the trial of cases involving fraudulent violations of the election laws. Offenses of this nature invade the rights of the people. It is of the highest public importance that the administration of justice be preserved inviolate and that all sources of government be kept free from contamination.

All of the elements essential to an investigation by a grand jury are present. The court acted upon knowledge gained from trustworthy information; a cognate

offense was charged and the investigation was directed against "things rather than individuals." The criminal acts, the subject of investigation, were such that the ordinary process of the law was inadequate in this respect, at least, that the public would suffer from delays incident to ordinary procedure. The object to be attained was the suppression of a public evil affecting in its influence communities rather than individuals. The information available indicated a conspiracy widespread in its scope and since all of the offenders were unknown, an investigation by a grand jury under all of the circumstances, was the appropriate procedure. The principles involved are the subject of thorough discussion in the recent cases, *McNair's Petition*, 324 Pa. 48, 187 A. 498; *Dauphin County Grand Jury Proc.* 332 Pa. 289, 2 A. 2d 783; *Com. v. Hubbs*, 137 Pa. Superior Ct. 229, 8 A. 2d 611, as well as in the leading case, *Lloyd & Carpenter's Case*, supra. If a prosecution results from the investigation the indictment must charge specific offenses and it is no valid objection to the procedure that the same charges, if the facts had been known, might have been initiated by information followed by preliminary hearing.

That one or more of those who were subsequently made defendants were called as witnesses before the grand jury does not affect the regularity of the proceeding. Since the investigation is directed against things rather than persons, the grand jury is not prohibited from calling a witness at the risk of vitiating the proceeding if ultimately the inquiry indicates that he is one of the offenders. The record, here, shows that in each instance when a witness refused to answer before the grand jury on the ground of self-incrimination, he was taken before the court and was instructed as to his rights and those rights were respected. This is all that is required.

The refusal of the court to grant bills of particulars

is another error assigned. The indictments were found on November 28, 1938. Motions to quash were refused on February 17, 1939 by the court en banc. On February 23, 1939 defendants moved for bills of particulars in both cases which were refused the same day. The cases then had been set for trial on March 14, 1939. We find no substantial merit in this assignment. Defendants were not entitled to a bill of particulars as of right. Such application is an appeal to the sound discretion of the court. *Com. v. Powell,* 23 Pa. Superior Ct. 370; *Com. v. Sabo,* 83 Pa. Superior Ct. 166. When a bill of particulars is ordered, it is not because the defendant has the right to demand it, but because the court after trial on proof of surprise or injustice because of the lack of advance information as to the specific acts and the attending circumstances proven by the Commonwealth in the interest of justice would be impelled to set aside the verdict and grant a new trial. *Com. v. Buccieri,* 153 Pa. 535, 26 A. 228. In the instant case we find no evidence that defendants were surprised or otherwise injured by the refusal of the court to order bills of particulars. Hence, while we are of the opinion that the court well might have granted defendants' application, since there had been no preliminary hearing, we are not prepared to say the court abused its sound discretion. In *Com. v. Zuern,* 16 Pa. Superior Ct. 588, the defendants similarly were indicted and convicted of conspiracy without having had a preliminary hearing and an assignment of error based on the refusal of the trial judge to order a bill of particulars was dismissed for the reason that on the trial it did not appear that the defendants were surprised by any unexpected proof submitted by the Commonwealth.

There is sufficient competent evidence of the facts relating to the Baszo incident, recited above, and of the following:

In defendant Rhey's house three envelopes were found containing similar typewritten lists of names of jurors.

He said he had received them from a stranger. In defendant Pryel's house an envelope was found upon which was written the telephone number of Wentz' Hotel and a card with the telephone number of John A. Leonette. The latter had formerly worked under Hobart Rhey in the State Highway Department.

On November 12, 1938 Leonette met Rhey and a Mr. Frank (whom he did not know and at the trial was unable to identify as Joseph Frank, defendant), by appointment in an Alderman's office. They retired to a private room and there Frank withdrew typewritten slips of the names of jurors from an envelope and handed them to Leonette. Rhey referred to the election case and asked if he knew any of the jurors. They requested him "to find out whether these people were good Democrats and whether they would appear friendly if approached on the subject of this particular case." Leonette destroyed the slips and did nothing. This testimony was limited by the court, as direct evidence against Rhey alone.

On November 11, 1938, defendants Rhey and Pryel went to Wentz' Hotel in Millvale and inquired of the proprietor concerning one Hobart Schweikert, one of the jurors on the panel, as to whether he was approachable. They were directed to a nearby tavern where Schweikert was working and there Pryel talked with him and told him that "he had a case coming up in court from Homestead and said if I can do anything for them they would appreciate it." Rhey joined them while they were talking, but said nothing.

Harry Kart a deputy constable in Pittsburgh was called on the telephone by Joseph Frank whom he knew well and whose voice he recognized. Frank said that he was going to send him something and requested him to "take care of it." An envelope was sent him containing slips with the names of three or four jurors on each. In the course of the conversation Frank said: "I am sending you up these names. I want you to go out and see

what you can do about them and I want a report back Monday because the case comes up on Tuesday." He, too, destroyed the slips and did nothing.

In the above incidents there is sufficient evidence of concert of unlawful action of defendants Rhey, Pryel and Frank, and as to Rhey and Pryel, there is direct evidence of the corrupt solicitation of the juror, Hobart Schweikert.

Other assignments aver that the court erred in refusing to charge the jury that the evidence against the defendants was wholly circumstantial.

As to circumstantial evidence the trial judge charged: "Sometimes in conspiracy cases the Commonwealth offers a witness who gives direct testimony of the agreement or the combination entered into by the defendants. Such a witness might give the time, place and what was said and what was agreed to by each defendant. However, in a prosecution for conspiracy, it is not necessary for the Commonwealth to prove an express confederation, but the case may be made out by such evidence as leads to the conclusion that an unlawful combination to do an unlawful act existed, but the evidence must logically tend to such conclusion. On this question our Supreme Court has repeatedly laid down for us the following principle on this matter . . . . . . 'When a charge of crime is sought to be sustained by circumstantial evidence, the hypothesis of guilt should flow from the facts and circumstances proved, and be consistent with them all. The evidence must be such as to exclude to a moral certainty every hypothesis but that of guilt of the offense imputed; the facts and circumstances must not only be consistent with and point to the guilt of the accused, but they must be inconsistent with his innocence.' Therefore, so far as the proofs of defendants' guilt of these charges rest upon circumstantial evidence the evidence must be incompatible with the innocence of the defendants upon any rational theory and incapable of explanation upon any rational theory and in-

capable of explanation upon any other reasonable hypothesis than that of guilt, otherwise the defendants should be acquitted of these charges."

Appellants contend that there is no direct evidence of the conspiracy or of embracery and complain of the refusal of a number of points requesting instructions to that effect. It is certain that defendants were not entitled to an affirmance of these points. There is positive evidence of active participation by all three appellants in concert and separately in an effort to corrupt jurors directly or through others. The inferences from their acts were either·implications of law or of fact and as to the latter the rule as to circumstantial evidence applies. The rule was correctly and adequately stated in the charge of the court. *Com. v. Bardolph,* 326 Pa. 513, 192 A. 916.

"That which gives to the crime of conspiracy its distinctive character is unity of purpose, unity of design, focalization of effort upon a particular project by the persons named in the indictment": *Com. v. Zuern,* supra. And to establish a conspiracy it is not necessary that the specific terms and scope of the agreement be first shown. If that were the rule it rarely would be possible to convict except on the testimony of one of the conspirators. Therefore it has been generally held that where the acts of the parties indicate that they were acting in concert to a common end, the jury properly may be permitted to infer that such concerted action was the result of an agreement. The joint assent of minds, required to sustain a charge of conspiracy may be inferred from facts which establish to the satisfaction of the jury beyond a reasonable doubt that the conspiracy had been formed. *Com. v. Jermyn et al.,* 101 Pa. Superior Ct. 455; *Ballantine v. Cummings,* 220 Pa. 621, 70 A. 546; *Com. v. Strantz,* 328 Pa. 33, 195 A. 75.

It is contended that the proof at most, establishes a conspiracy *to solicit others* to commit embracery, (a

common law offense, *Com. v. Wiswesser*, 134 Pa. Superior Ct. 488, 3 A. 2d 983), and that the proof is at variance with the indictment charging conspiracy to commit the statutory crime•of embracery.

We are convinced that there is sufficient competent evidence to establish the conspiracy to commit embracery as charged. From the positive evidence that these defendants on a number of occasions attempted to induce others to commit embracery and particularly from the testimony of Leonette the inference is reasonable that their agreement contemplated the commission of the substantive offense as well. And even disregarding the Schweikert incident, directly involving two of the defendants in the commission of embracery, the testimony is sufficient to support the inference of the existence of the conspiracy charged in the indictment. That inference as indicated by the verdict, under all of the evidence is incompatible with the innocence of the defendants of the charge, "upon any rational theory."

Is there sufficient evidence to convict the defendant Frank of the charge of embracery?

The scope of the conspiracy included the commission of embracery and in addition, there is sufficient direct evidence to convict Pryel and Rhey of that offense in the attempt to influence the juror Schweikert. Frank is not absolved from guilt on that charge merely because he was not present on that occasion and never approached Schweikert. When a conspiracy is shown, the acts of any conspirator done in its prosecution and furtherance are admissible against any or all of the conspirators. Underhill Crim. Ev. 2d 492; Henry Pa. Trial Ev. 271 and the many cases there cited. "The general rule is well settled that if two or more persons enter into a combination or confederation to accomplish some unlawful object, any act done by any of the participants in pursuance of the original plan and with reference to the common object is, in contemplation of law, the act of all. Each conspirator is responsible for

everything done by his confederates which follows incidentally as one of the probable and natural consequences in the execution of the common design, even though such a consequence was not intended as a part of the original design or common plan": 11 Am. Jur. 548 §8. "No principle of law is more firmly established than that when two or more persons conspire or combine with one another to commit any unlawful act, each is criminally responsible for the acts of his associate or confederate committed in furtherance of the common design. In contemplation of law the act of one is the act of all": *Com. v. Strantz,* supra. "An overt act charged to be done by one conspirator, in pursuance of the conspiracy, is to be considered as the act of all": *Collins v. Com.,* 3 S. & R. 220; *Com v. Spardute,* 278 Pa. 37, 122 A. 161. "In this offense, [conspiracy] there is no accessory. It must be recollected, the conspiracy is a matter of inference, deducible from the acts of the parties accused, done in pursuance of an apparent criminal purpose, in common between them, and which rarely are confined to one place; and if the parties are linked in one community of design and of interest, there can be no good reason, why both may not be tried, where one distinct overt act is committed; for he who procures another to commit a misdemeanor, is guilty of the fact, in whatever place it is committed by the procuree": *Com. v. Gillespie et al.,* 7 S. & R. 469, 477.

We have examined each of the remaining assignments of error and are unable to find substantial merit in any of them.

The judgments are affirmed and it is ordered that each defendant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with the sentence imposed or any part of it which has not been performed at the time the appeal in this case was made a supersedeas.